In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2861

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY CALABRESE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 239—**Amy J. St. Eve,** *Judge.*

ARGUED MAY 28, 2009—DECIDED JULY 14, 2009

Before EVANS, WILLIAMS, and TINDER, *Circuit Judges*.

EVANS, *Circuit Judge.* A jury convicted Anthony Calabrese of three counts of robbery and three counts of using a firearm in connection with those crimes. On appeal, he asks us to reverse his convictions on several grounds: that the court should have conducted separate trials for each of the robberies; that the judge should have excluded an audiotape that recorded what was said during a beating administered to a potential witness; and that the evidence was otherwise insufficient to support the convictions. Failing that, Calabrese seeks

resentencing because he says the one he received, though consistent with our decision in *United States v. Roberson*, 474 F.3d 432 (7th Cir. 2007), is excessive. We review the facts in the light most favorable to the verdict. And so viewed, the facts read like a Nicholas Pileggi/Martin Scorsese screenplay.

The evidence established that a group of Chicago-area thugs knocked off three local businesses in a crime spree that stretched from April to September 2001. The robberies were orchestrated by Calabrese from the back office of his auto shop (Tony C's First Impressions), and everything generally went according to plan. Afterwards, however, police nabbed one of the crew members and persuaded him to cooperate. The main target was Calabrese. Besides his role in the robberies, Calabrese was supposedly linked to organized crime. He was also the suspected triggerman in a pair of unsolved mob hits.[1] Outfitting the cooperating witness with a wire—and turning other crew members in the meantime—the police eventually gained enough evidence to charge Calabrese with the robberies. Whether the police planned all along to use those charges as leverage in the murder case or not—those deaths remain un- solved—Calabrese went to trial on the lesser charges and ended up with an effective life sentence. Along the way the jury heard tales of violence that made Calabrese

---

[1]  Steven Warmbir, *The Tony Calabrese Trial So Far*, Chicago Sun-Times Blog (Feb. 7, 2008) *at* http://blogs.suntimes.com/mob/ 2008/02/the_tony_calabrese_trial_so_fa.html (last visited June 1, 2009).

look like Tommy DeVito[2] come back to life.

The first job was to knock off a store called the Leather Connection. Apart from Calabrese, the crew consisted of Robert Cooper, Sean Smith, Walter Polino, and Marcus Baker. After meeting up at the auto shop, the gang took off in two vehicles—Polino's car and a cargo van rented by Calabrese—and headed for the store. Calabrese gave Cooper a roll of duct tape and a gun; they were locked and loaded. But then, following a cell-phone conversation in which he obtained more information about the target, Calabrese had second thoughts. He directed the crew to stop at a Chinese restaurant so they could discuss the plan over lunch. Feeling better on a full stomach, Calabrese decided they should go for it.

Cooper strolled into the store with Smith and, flashing his pistol, forced the owner, Cary Feldman, and Feldman's mother, Molly Nudell, into a storeroom. Calabrese followed and watched as Cooper bound them with duct tape. Then the threesome got to work loading leather coats into the van—together with roughly $10,000 dis-

---

[2] Tommy DeVito is the violent sociopath played by Joe Pesci (who won the Academy Award for Best Supporting Actor) in the 1990 movie classic *Goodfellas*. The movie, directed by Martin Scorsese and based on a nonfiction book (*Wiseguy*) by Nicholas Pileggi, recalls, among other things, the travails of mobster "Two-Gun Tommy" DeSimone, the best buddy of the real-life lead character in the movie (Henry Hill) played by Ray Liotta. As the movie opens, Hill harkens back to how it all began, explaining that, at the age of twelve, his ambition was to become a gangster: "To me," he explains, "being a gangster was better than being the president of the United States."

covered along the way—while Polino and Baker remained in the car as lookouts. Afterwards the crew split up—Calabrese went back to First Impressions, and the rest of the gang hit up a local bar for a few drinks until Calabrese called them back to divvy up the booty. Calabrese kept the lion's share.

The next target was the Metamorphous Tattoo Parlor. It wasn't a robbery so much as a beat-down. The "artist," who was co-owner of the shop, supposedly tattooed a mob boss's underage daughter, and the father was none too pleased. Instead of working this one personally, however, Calabrese asked associate Ed Frank to find some guys to shut the place down for good. Frank in turn reached out to his drug dealer, Martin Flores, who said he was game. When the three met up at First Impressions to cover the details of the job, Calabrese stressed three things: Flores needed to break the artist's hands; he needed to steal the tattoo machines; and he needed to take ID cards from any witnesses to deter them from contacting the police.[3] Flores agreed. After recruiting his cousin and another buddy—and picking up plastic zip ties and a gun supplied by Calabrese—Flores and his pals proceeded to the job.

Flores and the other hoods came through the door in classic stick-up fashion. Flores waved his pistol and ordered everyone to the floor, and his sidekicks

---

[3] Another scene right out of *Goodfellas*, when Robert DeNiro's character (Jimmy "the Gent" Conway) confiscates the drivers license of a trucker whose cargo has just been hijacked, reminding him that "now I know where you live."

restrained the bunch with zip ties. Although that was the extent of the terror for three of the four victims, Mike Farell (the "artist") was in for special treatment. Following through on Calabrese's orders, the crew pulled Farell into the back and beat him severely, pounding his hands with a hammer. They then told Farell to "get out of Lockport," rounded up the expensive tattoo equipment and everyone's ID, and fled the scene. Once again, the rendevous point was First Impressions. At Calabrese's direction, Frank paid Flores and his buddies for their work. Calabrese took the stolen machines and ID cards, and they called it a day.

The final job was a plain old cash grab, though it turned out to be far less lucrative than Calabrese had hoped. The target this time was Morris' Meat Packing. One of Calabrese's associates, Richard Dawson, had a friend on the inside who said the joint kept large amounts of money on site, perhaps as much as $200,000. That proved to be wishful thinking, as the crew scored only a little over $15,000. Once again, Calabrese organized the heist. He tapped Frank as his partner, and when Dawson recruited Dave Sims, the gang was set at four. On the way to the store, Calabrese told Frank and Dawson that the three of them would go inside while Sims waited as the getaway driver. Dawson objected, however, so Sims took his place. When the three entered the store, Calabrese and Sims were packing heat. They headed to the back office where Frank Masellis, one of the shop's owners, was talking with Irma Powell, the mother to one of its retail butchers. Calabrese demanded cash, and Masellis handed him $15,500 from a pair of file cabinets. Before fleeing, Calabrese took Masellis's driver's license and

told him that if he didn't keep quiet, his kids would end up dead. When the crew reconvened at First Impressions, Calabrese once more kept the bulk of the loot; he gave $1,000 each to Dawson and Sims, and $1,300 to Frank.

The jury heard all about this saga through a collection of victims and accomplices turned state's evidence. Though the accomplices had their share of credibility issues—and the victims' memories seemed cloudy at times—the testimony overwhelmingly portrayed Calabrese as a ruthless crook constantly on the prowl for new scores. And if there were any doubt about just how violent he was, a recorded conversation made it clear as day.

A few months after the crime spree, Frank showed up unexpectedly at First Impressions. Calabrese was there, as was Cooper, but they were suspicious. For whatever reason—perhaps because Frank was recently in custody on an unrelated charge—Calabrese and Cooper were concerned that Frank was cooperating with authorities, maybe even wearing a wire. Their instincts were right, of course, but despite searching Frank they never found the bug. Instead, the wire captured the whole conversation, including references to crime, death threats to Frank, and a few knocks so he wouldn't forget. Here's a sample of what the jury heard:

> CALABRESE: I mean any little stupid shit you know that goes on around here, you know to keep your mouth shut. I mean you understand what'll happen?
>
> FRANK: Tony, do I look like I wanna be dead?

COOPER:       No one said . . .

CALABRESE:   Nobody said you're gonna be dead.

FRANK:        I, I know the seriousness of what goes on here. I ain't stupid.

CALABRESE:   There ain't no seriousness. I mean, you know when people get in trouble sometimes they fuckin' make shit up. We don't want you to fuckin' be making anything up, that's all. I fuckin' bust my balls here all day long, I got enough fuckin' shit going on here. I don't need no, don't need nobody else to fuckin' start rumors or fuckin' shit, so.

              . . . .

COOPER:       Where you living at?

FRANK:        In a hotel.

COOPER:       Which hotel?

FRANK:        Eh, why is that all that necessary?

COOPER:       Because I asked for it, that's why.

CALABRESE:   Yeah, why?

FRANK:        Tony, I don't really feel safe to say.

COOPER:       Why not?

CALABRESE:   Fuck you, motherfucker, fuck you, what did you say? Fuck you.

(Fighting in the background)

FRANK:          I'm sorry, I'm sorry, I'm sorry, I'm sorry, I'm sorry.

CALABRESE:      Fuck you.

FRANK:          I'm sorry, I'm sorry, I'm sorry.

CALABRESE:      Cocksucker. Fuckin' did everything for you, you're gonna act like that to me.

FRANK:          I'm sorry, Tony.

CALABRESE:      Fuck you.

COOPER:         Punk ass bitch. Get your ass back up. You wanna feel safe? I'll give you something safe. Remember the last time, I told you? Do you?

FRANK:          Yes, sir.

                . . . .

CALABRESE:      Let me tell you something. Anything fuckin' happens, anything happens to me, anything around here, we'll fuckin' kill you.

The judge excluded the worst parts of the tape—death threats to Frank's family—but, as one can see, the balance was pretty awful.[4]

   With all this evidence, finding Calabrese guilty as charged was an easy task. Sentencing was more diffi-cult. Though the judge viewed the crimes as "very violent,"

---

[4] The judge also excluded, throughout the trial, any references to organized crime.

she was troubled by the statutory minimums on the three gun counts. Under 18 U.S.C. § 924(c)(1)(A)(ii), she was required to impose at least a seven-year sentence for the first gun conviction and, under § 924(c)(1)(C)(i), consecutive sentences of at least 25 years for each of the other two convictions. So that made 57 years at a minimum, and it had to run consecutively to whatever sentence the judge imposed for the robbery counts. Had she the liberty to do so, the judge said she would have considered the 57-year minimum when crafting the robbery sentence. But the judge felt compelled by our decision in *Roberson* to view the robberies independently. Accordingly, she sentenced Calabrese to 67 months—still below the guidelines range—for the robbery convictions. All said and done, Calabrese, 42 at the time, caught a sentence just over 62 years (67 months, plus 7, 25, and 25 years, all consecutive).

Calabrese's first argument is that the court should have conducted a separate trial for each robbery. The general rule, of course, is that multiple counts can be charged in a single indictment "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Calabrese does not argue that this standard was not met; he concedes that all counts were properly brought together in the indictment. Nevertheless, he says the court erred in denying his motion for severance under Rule 14. That Rule authorizes a court to order separate trials of counts if a single trial "appears to prejudice a defendant or the government . . . ." Fed. R. Crim. P. 14(a).

When the initial joinder is not at issue, we review denial of a severance motion for abuse of discretion. *United States v. Quilling*, 261 F.3d 707, 714 (7th Cir. 2001). Apart from the hurdle of deferential review, the Rule 14 standard is exacting: "The defendant must be able to show that the denial of severance 'caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him a better opportunity for an acquittal.'" *Id.* at 715 (quoting *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir. 1998)). "Because Rule 14 assigns to the district court the task of balancing the cost of multiple trials against the possible prejudice inherent in a single trial, a defendant bears 'an extremely difficult burden' of showing that the district court abused its discretion." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002) (quoting *United States v. Moore*, 115 F.3d 1348, 1362 (7th Cir. 1997)).

Measured against this standard, we must reject Calabrese's argument. He claims that he was prejudiced because the evidence was shaky as to his involvement in each individual robbery, but when the jury heard about his role in the overall scheme it likely borrowed evidence from the other robberies to reinforce a finding of guilt. Certainly, evidence of other crimes or bad acts can have a tendency to influence a jury's analysis, which is why Federal Rule of Evidence 404(b) prohibits this evidence to prove a criminal character. But the judge instructed the jury that "[e]ach count and the evidence relating to it should be considered separately," and there is nothing to indicate the jury ignored this command.

Moreover, the premise of Calabrese's argument is flawed—the evidence was *not* shaky as to each individual robbery; it was overwhelming. So even if there was some improper "spill-over effect," it was harmless error. Calabrese has failed to establish that holding a single trial caused him actual prejudice. On top of that, if separate jury trials were conducted, a good bit of evidence about the other robberies would have no doubt been properly received by the jury as Rule 404(b) evidence to show things like intent, preparation, motive, and absence of mistake.

Similarly, Calabrese fails to show reversible error in the admission of the audiotape. We review this claim for an abuse of discretion, as the district court has broad latitude to control the admission of evidence. *United States v. Ozuna*, 561 F.3d 728, 738 (7th Cir. 2009). We will reverse only where "no reasonable person could take the view adopted by the trial court." *Id.* Here, the trial court determined both that the conversation on the audiotape was relevant and that, with the worst parts excised, its probative value was not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. A reasonable person could take that view. Relevance cannot be genuinely disputed; we have repeatedly observed that intimidation of a witness suggests consciousness of guilt, *United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002); *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990), and the inference holds true in this case. There's just not much to the argument that the conversation lacked relevance because it didn't explicitly refer to one of the crimes at issue. As a practical

matter, specifics were unlikely to come up because Calabrese was worried about a wire. And the possibility that they were talking about another crime only made the conversation incrementally less relevant, not irrelevant altogether. On the other hand, whether the risk of unfair prejudice outweighed that relevance is a closer call. Letting the jury *hear* the sounds of the beating, as opposed to providing a transcript, might, in some minds, seem over the top. But the judge might have reasonably thought that the tape worked better overall. Voices can reveal meaning that words alone might mask (e.g., insincerity when Calabrese insisted, "There ain't no seriousness."), and the beating showed just how concerned Calabrese really was. True, a reasonable judge could have decided to use a transcript instead, or even to eliminate some of the vulgarities, but that's just the point—reasonable minds can differ. There was no abuse of discretion.

Turning to Calabrese's final argument against the convictions—insufficiency of the evidence—we find that we have already answered it. Viewing the evidence in the light most favorable to the verdict, the facts at trial placed Calabrese at the center of every robbery. Indeed, Calabrese does not contend that the testimony, if believed, would be inadequate. His only claim is that many of the witnesses lacked credibility. That's a pretty desperate argument because we do not second-guess jury credibility determinations. *See United States v. Brandt*, 546 F.3d 912, 917 (7th Cir. 2008). Granted, there can come a point where testimony is so implausible that it cannot be trusted as a matter of law. But that category of testi-

mony is exceedingly narrow: "For a witness's testimony to be held incredible as a matter of law, 'it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. McEntire*, 153 F.3d 424, 435 (7th Cir. 1998) (quoting *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir. 1989)). Yet, Calabrese doesn't argue these sorts of things. He simply points to relatively minor inconsistences (like whether the crew wore masks during the Leather Connection robbery) and motive to lie. Neither inconsistencies nor motive to fabricate are capable of rendering testimony legally incredible. *Id.*; *United States v. Wilson*, 31 F.3d 510, 514 (7th Cir. 1994).

That brings us to sentencing. Calabrese does not argue that the court erred in crafting his sentence under prevailing law. Instead, he asks us to change the law. In *Roberson*, we held that the mandatory add-on sentence flowing from using a gun in a crime of violence may not be used to justify a lower sentence on the underlying offense. *Roberson*, 474 F.3d at 436. To take such an approach, we explained, would be to contradict "Congress's determination to fix a minimum sentence for using a firearm in a crime of violence." *Id.* Even shaving off a single month from the sentence on the predicate crime thwarts Congress's will:

> If the judge reduces the defendant's sentence on the underlying crime of violence from, say, 50 to 49 months *because* the defendant used a gun and there-

> fore (if it was brandished) must be sentenced to 84 months on top of the sentence for the underlying crime, the effect is to reduce the statutory minimum sentence from 84 months to 83 months.

*Id.* Courts don't have that power. We *do* have the power, on the other hand, to overturn a prior decision in the presence of "compelling reasons." *United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001). But Calabrese doesn't offer any. The fact that the law may *possibly* be different in other circuits, *see United States v. Vidal-Reyes*, 562 F.3d 43, 56 (1st Cir. 2009) (holding that district court had authority to consider statutory minimum for identity theft, 18 U.S.C. § 1028A, when imposing sentence for *non-predicate* crimes charged in the same indictment); *United States v. Ciszkowski*, 492 F.3d 1264, 1268 n.3 (11th Cir. 2007) (observing, but not passing judgment on, decision to impose a lower sentence due to § 924(c)); *United States v. Angelos*, 345 F. Supp. 2d 1227, 1260 (D. Utah 2004) (imposing sentence of one day on other counts in light of § 924(c) add-ons), *aff'd*, 433 F.3d 738 (10th Cir. 2006) (affirming without comment on this issue), does not by itself constitute a "compelling reason" to disrupt our precedent. We are satisfied that the rule we adopted is the only choice consistent with separation-of-powers principles, and we are comforted by the fact that the appellate courts that *have* ruled on this issue tend to agree, *United States v. Chavez*, 549 F.3d 119, 133-35 (2d Cir. 2008); *United States v. Hatcher*, 501 F.3d 931, 933 (8th Cir. 2007); *United States v. Franklin*, 499 F.3d 578, 583-86 (6th Cir. 2007).

Under *Roberson*, we simply ask whether Calabrese's

sentence for the underlying crimes was reasonable, putting to the side any concerns arising from the § 924(c) add-ons. 474 F.3d at 437. It's somewhat unfortunate that we have to analyze the sentence for the robberies in a vacuum, but that is what Congress has effectively asked us to do. Considering the violent nature of the robberies and Calabrese's pivotal role, the trial court's *below-guidelines* concurrent sentences of 67 months on each of the three robbery counts is not unreasonable.

The convictions and sentence are AFFIRMED.