In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2334

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL LEE MOKOL, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:08-CR-97—**Joseph S. Van Bokkelen**, *Judge.*

ARGUED MARCH 31, 2011—DECIDED JUNE 22, 2011

Before CUDAHY, POSNER and MANION, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Appellant Michael Lee Mokol, Jr., appeals from his conviction for two counts of being a felon in possession of a firearm. He raises four trial procedure issues, three of which pertain to evidence and one of which pertains to jury instructions. We do not credit Mokol's arguments, and accordingly we affirm the judgment of the district court.

## I. Background

Michael Mokol was charged with four counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), in connection with two residential burglaries in early May of 2008. He was acquitted of the two charges stemming from the first burglary. He was convicted of possessing the gun stolen in the second burglary, and of possessing a magazine containing ammunition that was in his car when he was arrested. On appeal, he raises several issues related to trial procedure. We reproduce only those facts relevant to his arguments on appeal, as related by the witnesses at trial.

Louis Batides testified that in April of 2008 he separated temporarily from his wife and moved to the Deluxe Inn in Merrillville, Indiana. He brought with him a silver Smith & Wesson 9mm model 5903 handgun. While staying at the Deluxe Inn, he conversed with an unknown person who knew Michael Mokol. Batides had attended Merrillville High School with Mokol, and the unknown intermediary offered to put them back in touch. Within a few days, Mokol called Batides and arranged to visit him at the Deluxe Inn. When Mokol arrived, Batides showed him his silver Smith & Wesson. Mokol liked the gun, and asked whether Batides wanted to sell it. Batides answered no.

Batides and Mokol arranged to meet over drinks several days later, on May 6. Mokol arrived at the bar at 11:30 in the evening and chatted with Batides, but then received a phone call and left abruptly. When Batides returned to his hotel room, he discovered that

it had been burglarized. The door had been forced open and the silver Smith & Wesson handgun was missing. Batides tried to reach Mokol to tell him what had happened while they had been out, but Mokol never returned these calls.

Robert Flavin testified that in early May of 2008, Mokol came to him with a plan to steal a gun from a room in the Deluxe Inn. Mokol proposed that he would meet with the room's occupant (whom Flavin did not know) at a bar while Flavin and another burglar, Ryan Geary, broke into the room. Flavin testified that the three men went to Wal-Mart and purchased a crowbar in preparation. That evening, consistent with Mokol's plan, Flavin and Geary broke into the room and stole a silver gun and a magazine. Flavin then called Mokol. They met in a Wal-Mart parking lot, where Flavin gave Mokol the gun.

Ryan Geary, twenty years old at the time of his testimony, testified that he was dating Michelle Arnold, Michael Mokol's daughter, at the time of the relevant events. According to Geary, Mokol proposed that Geary help Flavin break into a room at the Deluxe Inn. Geary agreed. His testimony generally corroborated Flavin's account of the Deluxe Inn break-in.

A crack cocaine user named Marco Ottomanelli testified that in early May of 2008, Mokol gave him a "silver spray like" 9-millimeter Smith & Wesson, which he traded for crack cocaine that he and Mokol used together.

Detective Jeffrey Snemis testified that he was present at the scene when fellow police officers pulled Mokol's car

over in mid-May. Mokol was driving with a woman named Lori Miller. A handgun magazine was lying on the floorboard of Mokol's car.

The foregoing testimony encompasses the essential facts underlying Mokol's conviction of being a felon in possession of a firearm, and none of it is challenged on appeal. Mokol's appellate arguments relate instead to the testimony of his then-girlfriend Lori Miller and his daughter Michelle Arnold.

Lori Miller testified that at the time of the relevant events she was dating Mokol and was working as a dancer at a strip club (she could not remember the name of the club). She testified that Mokol had several guns, and that Mokol had her carry a silver handgun in her purse because he was not allowed to carry it. And of particular relevance to this appeal, she stated that Mokol told her that "[i]f anybody tells on [me, about the burglaries or firearms], they would end up in the ground."

Michelle Arnold, twenty years old at the time of her testimony, testified as a Government witness. Two parts of her testimony are contested on appeal. First, she testified to an incident that occurred in the parking lot of the Rising Sun nude dancing club, when Lori Miller was working inside. Michelle testified that, when she arrived at the Rising Sun, her father "got in the car and pulled a gun, and said, 'How much you got?' And I said, 'Just fifty.' And he put [the gun] back. It wasn't meant to be a threat or scare, it was a joke." Michelle stated that the gun Mokol used in this prank was black and silver.

The jury never heard the second significant portion of Michelle Arnold's testimony: because of objections, the judge excused the jury and allowed defense counsel to make a proffer while he considered the testimony's admissibility. At that time, Michelle testified to an incident in the parking lot of the Lake County jail, where she had gone to visit her father after he was arrested on the present charges. She testified that when she returned to her car from the jail, she found some cocaine in the car's interior door handle. It occurred to her that perhaps the police were setting her up to secure her cooperation against her father. Her testimony was, in relevant part:

> Defense Counsel: Now—and at that time—you sincerely believed that law enforcement officers may have put those drugs on you, correct?
>
> Michelle: I didn't sincerely believe. It has crossed my mind, yes.
>
> Defense Counsel: But you do believe somebody planted those drugs on you?
>
> Michelle: I didn't have drugs, so I believed somebody put something in my car.
>
> *   *   *
>
> Defense Counsel: Let me ask you this. Do you have, or at any point since you have been cooperating with the government, have you had any fear that you might be charged with something?
>
> Michelle: No.

Defense Counsel: You have no fear that you would be charged?

Michelle: No.

Defense Counsel: None at all?

Michelle: None at all.

At the end of a lengthy proffer, the district court determined to preclude defense counsel from cross-examining Michelle about this incident. The judge stated that it was irrelevant, and that in the alternative it should be excluded under Federal Rule of Evidence 403 because it would tend to confuse the jury.

Finally, when charging the jury, the district court instructed the jury, over Mokol's objection, with this court's pattern jury instruction with respect to constructive possession (of the gun and magazine). Mokol voiced the concern that this instruction would allow the jury to improperly convict Mokol on the basis of the physical possession of the gun by others.

As noted, the jury returned a guilty verdict with respect to the possession of Batides's gun and an ammunition magazine. The judge imposed a sentence of 262 months of incarceration followed by five years of supervised release. Mokol timely appealed, and presents the following issues for our consideration:

(1) Whether the district court abused its discretion in admitting bad acts testimony through Lori Miller's testimony as to Mokol's statement that he would put anyone who told on him "in the ground";

(2) Whether the district court abused its discretion in admitting bad acts evidence involving Michelle's testimony about the gun "prank" in the Rising Sun parking lot;

(3) Whether the district court offended Mokol's confrontation clause rights in restricting cross-examination of Michelle; and

(4) Whether the district court abused its discretion by instructing the jury as to constructive possession.[1]

## II.  Analysis

### 1.

We first address the admissibility of Lori Miller's testimony that Mokol stated that anyone who informed on him would "end up in the ground." This testimony fits comfortably within the widely recognized principle that a defendant's attempts to intimidate potential witnesses are probative of his consciousness of guilt. *See, e.g., United States v. Johnson*, 624 F.3d 815, 820-21 (7th Cir. 2010); *United States v. Calabrese*, 572 F.3d 362, 368 (7th Cir. 2009); *United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002); *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990). Rule 404(b), restricting bad acts evidence, will ordinarily not keep such evidence from the jury. *See Miller*, 276 F.3d at 373-74; *United States*

---

[1]  These issues have been slightly reworded and reordered for convenience in analyzing them.

*v. DeAngelo*, 13 F.3d 1228, 1232 (8th Cir. 1994) ("[A]s direct evidence of the crime charged, the evidence of threats is not even Rule 404(b) evidence."). Mokol attempts to factually distinguish his case on the ground that, unlike in some of the cases cited, the threat was not made while Mokol was in custody. This is unavailing, because this line of precedent has permitted evidence of threats made in a variety of factual contexts. *Compare Calabrese*, 572 F.3d at 366-67 (organized crime boss captured by wire threatening suspected informant) *with United States v. Zierke*, 618 F.3d 755, 758 (8th Cir. 2010) (defendant who had been in jail for over seven months encouraged son to harm witnesses) *and United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (murder suspect was convicted for reckless endangerment and assault on victim's mother who was cooperating with authorities).[2]

Further, the district court did not abuse its discretion in treating this evidence as more probative than prejudicial within the meaning of Rule 403. The court entertained a lengthy sidebar in advance of Miller's testimony, and ultimately credited the Government's argument that it showed Mokol's consciousness of

---

[2] The Government raises another reason this testimony might have been properly admitted: because it tends to explain why, in her early discussions with law enforcement, Lori Miller related a different account of the facts that tended to exculpate Mokol. Having held the first argument sufficient and the testimony properly admitted, we need not reach the Government's alternative argument.

guilt. This determination was well within the court's considerable discretion.

2.

We disagree with Mokol that the district court erred or abused its discretion by admitting Michelle Arnold's testimony that Mokol had jokingly pointed a handgun at her in the parking lot of the Rising Sun strip club. Since this was understood and apparently intended as a joke, it is not clear why its import must be seriously analyzed. Michelle's description of the gun Mokol brandished was similar (although not identical)[3] to the description of the gun stolen from Batides's hotel room on the evening of May 6, so its possession may simply be evidence of the crime charged. The defendant challenges this interpretation on the ground that Michelle said the event occurred in late April, before the May 6 burglary. But she also testified that Lori Miller was inside the Rising Sun working at the time of the incident—and that could not have been the case in late April because Lori Miller was in jail until May 8. If one credits Michelle's statement that Lori Miller was inside the Rising Sun working, then the gun very well could have been Batides's. The existence of some uncertainty as to the date of events does not transform direct evidence of guilt into imper-

---

[3] Michelle Arnold testified that the gun was "black and silver." Batides testified that his gun was "silver."

missible "prior bad acts" testimony. Discrepancies as to dates ordinarily go to the weight of testimony, not its admissibility, and the actual date of events is a proper matter for jury consideration. *See United States v. Byrd*, 771 F.2d 215, 224 (7th Cir. 1985); *United States v. Fleming*, 504 F.2d 1045, 1048 (7th Cir. 1974).

Since Michelle's testimony arguably served as direct evidence of Mokol's possession of the gun stolen from Batides, it was probative of the Government's felon-in-possession case. In any event, the Government did not highlight the significance of the incident, and Michelle herself downplayed it by testifying that she was not scared. There was therefore no error under Rule 404(b) or abuse of discretion under Rule 403.

3.

We review *de novo* the question whether the district court improperly restricted Mokol's cross-examination of Michelle Arnold as to her discovery of drugs in her car,[4] and find no error.

Exposing bias is a "core concern" of the Sixth Amendment confrontation clause. Nevertheless, a district court

---

[4] A court's limitation on a defendant's cross-examination is reviewed for an abuse of discretion, but whether the limitation offends the confrontation clause is reviewed *de novo*. *See United States v. Martin*, 618 F.3d 705, 727 (7th Cir. 2010). Exposing witness bias directly implicates the Sixth Amendment, and is reviewed *de novo*. *Id.*

may restrict cross-examination into such issues so long as the defense still has an adequate opportunity to explore the witness's motives and biases. *See Olden v. Kentucky*, 488 U.S. 227, 232 (1988) ("[A] trial court may . . . impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant . . . .'") (citation omitted); *United States v. Martin*, 287 F.3d 609, 620 (7th Cir. 2002) ("'So long as cross-examination elicits *adequate information* to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised.'") (quoting *United States v. Scott*, 145 F.3d 878, 888 (7th Cir. 1998)). Although the court foreclosed defense counsel from questioning Michelle Arnold about the incident in which she found drugs in her car after visiting her father in jail, the court did not generally prevent Mokol from probing into possible pro-Government bias, or fear of prosecution, on Michelle's part. Defense counsel extensively cross-examined her. Counsel elicited testimony, for example, that tended to show that her father had interfered with her relationship with her fiancé Ryan Geary, including by introducing him to drugs and simultaneously encouraging her to leave him because he was a drug user. Counsel also elicited testimony about Michelle's cooperation with the Government in advance of trial.

Moreover, Mokol's theory of Michelle Arnold's pro-Government bias was not very compelling. This is not a case where the court foreclosed a line of cross-examina-

tion without knowing where it would lead. The court gave defense counsel the opportunity to probe the issue outside the jury's presence.[5] At that time, Michelle Arnold testified both that she did not actually believe the police planted drugs in her car, and that she had no fear of prosecution. Given her express denial of Mokol's hypothesis, Mokol's insistence that Michelle's testimony would have exposed bias is not persuasive. *Cf. United States v. Saunders*, 166 F.3d 907, 919 (7th Cir. 1999)

---

[5] The district court's procedure in this regard was consistent with Fed. R. Evid. 103(c), which provides that "[i]n jury cases, proceedings shall be conducted . . . so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." The Advisory Committee Notes further clarify, "[t]he judge can foreclose a particular line of testimony . . . without a series of questions before the jury, designed at best to waste time and at worst 'to waft into the jury box' the very matter sought to be excluded." *See, e.g. United States v. Wilson*, 605 F.3d 985, 1011-14 (D.C. Cir. 2010) (upholding against a confrontation argument the district court's decision to foreclose a line of questioning after testimony outside the jury's presence proved fruitless for the defendant), *cert. denied*, 131 S. Ct. 841 (2010); *United States v. Dischner*, 974 F.2d 1502, 1514 (9th Cir. 1992) (same), *overruled on other grounds as stated in Loral Infared & Imaging Sys. v. ERA Helicopters*, Nos. 94-55821 & 95-55094, 1997 U.S. App. LEXIS 14850, at *2 n.2 (9th Cir. June 17, 1997); *see also United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (upholding against a due process challenge the exclusion of a defense witness after the court ruled her testimony outside the jury's presence irrelevant).

(district court properly restricted the defendant from cross-examining a testifying law enforcement agent on inspector general's investigation of the agent that ultimately absolved the agent, because it "would not have exposed a bias," since "a report concluding that the agent was not biased simply cannot be probative of his bias."). In other words, the court did not restrict Mokol from showing Michelle's bias because the proposed line of questioning did not reveal any source of bias.

The court properly determined that Mokol's proposed line of questioning had a tendency to confuse that outweighed its probative value under Rule 403.[6] In this connection, despite the simplicity of the charges against Mokol, his trial was not a simple affair. It lasted five days and featured sixteen witnesses, many of whom had criminal histories that surfaced in their testimony. Energetic advocacy on both sides led to numerous—even pervasive—objections and sidebars. The trial produced a transcript that spans over a thousand pages, exclusive of sentencing. Further, Michelle Arnold was probably not among the Government's most important witnesses. True, her testimony placed a silver handgun in Mokol's possession—but so did several other witnesses, and Michelle had no firsthand knowledge of the burglary through which the silver gun was obtained (unlike Flavin and Geary, who participated). Of course, none of this context diminishes

---

[6] Having so held, we do not reach the question of its relevancy under Fed. R. Evid. 402.

(or possibly could diminish) Mokol's confrontation rights, but it does underscore the credibility of the judge's concerns about confusing the jury with peripheral matters.

4.

Finally, the district court did not err or abuse its discretion in giving the jury a constructive possession instruction. Indeed, it was proper for the court to do so, because the Government's case included evidence that would support a conclusion that Mokol was a felon in possession through constructive possession: two examples are the handgun Lori Miller testified to carrying in her purse at Mokol's behest, and the handgun magazine on the driver's side floorboard of Mokol's car at the time of his arrest. And constructive possession was a permissible theory on which to convict Mokol for being a felon in possession of a gun. *See, e.g., United States v. Lloyd*, 71 F.3d 1256, 1268 (7th Cir. 1995).

We decline Mokol's invitation to hold that the Seventh Circuit Pattern Criminal Federal Jury Instruction for constructive possession misleads juries into convicting defendants on a conspiracy theory of liability. These two respective forms of liability have different elements, which the pattern jury instructions reflect.[7] The

---

[7] *Compare* Pattern Criminal Federal Jury Instructions for the Seventh Circuit, 18 U.S.C. § 922(g) (Definition of Possession) ("Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and

(continued...)

implication of Mokol's argument is that instructing a jury on any form of derivative liability creates an unacceptable risk that the jury will convict the defendant on some other. But we presume that juries understand and follow instructions. *See United States v. O'Neill*, 116 F.3d 245, 249 (7th Cir. 1997).

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[7] (...continued)
intention to exercise direction or control over it, either directly or through others.") *with* Pattern Jury Instruction No. 5.10 ("A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy.").

---