In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4251

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MYRON ROBINSON, a/k/a BOOJIE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 00067—**Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED NOVEMBER 10, 2009

Before POSNER, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* In 2003, Myron "Boojie"
Robinson gave law enforcement agents a signed state-
ment implicating himself in criminal firearms trafficking.
In 2008, he was indicted for conspiring to transport fire-
arms across state lines without a license and for
receiving firearms transported across state lines in viola-
tion of 18 U.S.C. § 922. Before trial, he filed a motion
to suppress the statement he had given to law enforce-

ment agents, arguing that he was interrogated in violation of his Fifth Amendment rights. The district court denied the motion. The case went to trial and Robinson was convicted. Robinson appeals, arguing that the district court erred in denying his motion to suppress. We affirm.

## I. Background

Myron Robinson is apparently one of those people who is blessed with the gift of gab, but in this case that gift turned out to his detriment. Over the years, his criminal associations have brought him into contact with quite a few federal and state law enforcement agents. Despite the apparent conflicts of interest, Robinson has kept in touch with several of these acquaintances. He has even called them for advice on critical personal decisions, such as where to find the best criminal defense representation. In 1995 and 1996, Robinson got to know FBI Special Agent R. Lee Walters and Assistant United States Attorney for the Northern District of Illinois Brian Netols. At that time, Robinson was a cooperating witness in an undercover sting investigation involving corrupt police officers. Robinson was paid cash for his cooperation, but during the investigation he made false statements to federal agents, which led to his guilty plea for violating 18 U.S.C. § 1001. He was sentenced to two years' probation. Over the next decade, Robinson kept in occasional contact with Agent Walters, calling him as often as three times per year to catch up and make small talk. Robinson also had some contact

with Netols over the years. Most recently, in early 2008, he contacted Netols and asked for a recommendation for an attorney to represent him in this case. Netols ended the conversation after determining Robinson had been charged in federal court and was represented by counsel.

Returning to 2002, after his brief stint assisting federal law enforcement (and presumably after his term of probation had expired), Robinson and Carlos Orr went into business together reselling ill-gotten guns in the Chicago area. Robinson used his connections in Shreveport, Louisiana to make straw purchases[1] of guns at pawn shops. He and Orr used their Chicago connections to sell the guns up north at a hefty profit. On at least two occasions, Robinson and Orr traveled to Shreveport and hired people without criminal backgrounds, including Reginald Dean, Teresa Woodward, and Mary Williams to make straw purchases of guns that Robinson and Orr had selected. When they had assembled the guns, Robinson and Orr boxed and shipped them via Federal Express to Robinson's home in Maywood, Illinois. Once the guns arrived in Maywood, Robinson removed the serial numbers and resold them to various buyers,

---

[1] A "straw purchase" occurs when one individual purchases a firearm on behalf of another individual but fills out the required Form 4473 as if he or she were the actual purchaser. Such purchases are often used when the individual who wishes to purchase the gun is prohibited from purchasing a firearm for some reason, such as a previous felony conviction. BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 165 (2005).

including Roynel Coleman, who had introduced Orr and Robinson. Sometime later, Chicago police officers recovered a .38-caliber High Point pistol and a 9-millimeter High Point pistol, both with serial numbers removed. Forensic specialists with the Illinois State Police were able to restore the serial numbers, which matched weapons that Woodward and Dean admitted to purchasing for Robinson in Shreveport.

In 2003, Robinson phoned Special Agent James Ferguson of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and set up a meeting at Robinson's mother's house in Maywood.[2] Ferguson was part of a task force with fellow ATF Agent Dave Balkema, Matt Gainer of the Illinois State Police, and Joseph Bowers from the Chicago Police Department. Before the meeting, Ferguson checked the National Crime Information Center database and discovered an outstanding warrant for Robinson for retail theft, originating out of the Lombard, Illinois, Police Department. When Ferguson and his team arrived at the Maywood residence, they were met by Charles Allen, Robinson's attorney. Allen asked Ferguson what they wanted and, after learning that the agents wished to discuss an investigation into firearms trafficking, informed Ferguson that Robinson would not talk to them about the investigation. At that point, Agent Gainer informed Allen that Robinson was going to be taken into custody on the outstanding warrant.

---

[2] It is not clear what motivated Robinson to make this call in the first place, but he apparently got Ferguson's number from a card that was left with Robinson's mother.

Robinson and the government dispute many of the details of the evening after that point. But in both versions, shortly after the police arrived at his mother's residence Robinson was arrested and transported to the Westchester, Illinois, Police Department at approximately 8:00 p.m. and later transferred to the Lombard Police Department shortly before midnight. While at Robinson's mother's house his lawyer unambiguously asserted Robinson's right to counsel before Robinson was arrested, and the government acknowledges that Robinson was not informed of his *Miranda* rights at his mother's house or during the car ride to Westchester. While at Westchester, however, Robinson signed a *Miranda* waiver and a detailed statement implicating himself in illicit firearms trafficking. After he signed the statement, he was eventually transported to the Lombard police station. Robinson's mother testified that she called the Lombard police station around 9:00 p.m. to inquire about her son's status, but neither she nor his attorney went to the Lombard police station that evening.[3]

In 2008, a grand jury indicted Robinson in a two-count indictment for conspiring to transport firearms purchased outside of Illinois and for receiving out-of-state firearms in Illinois.[4] Robinson moved to suppress the

---

[3] The record does not indicate what happened after Robinson was transported to Lombard, how he posted bond, or how he got home from the station.

[4] No explanation for the more-than-four-year delay between Robinson's incriminating statement in 2003 and his charging

(continued...)

incriminating statement from 2003. The district court held an evidentiary hearing, at which it heard testimony from, among others, Agents Ferguson and Gainer, and from Robinson, Robinson's mother, and Robinson's former attorney, Charles Allen.

Each side told varying versions of the 2003 events. Everyone at least agreed that Robinson called Agent Ferguson and that Ferguson and other law enforcement agents came to the Maywood residence at his request. All also agreed that Robinson was informed that he was being arrested pursuant to a warrant out of the Lombard Police Department. Ferguson testified that Agent Gainer told Robinson that he was going to be taken to the closer police department in Westchester, while Gainer testified that he did not recall whether he told Robinson or his attorney where he was going to be taken for processing. Robinson was given time to change his clothes and was then taken to the Westchester Police Department. According to Ferguson and Gainer, Robinson was not questioned outside of routine processing questions and was not informed of his *Miranda* rights. After about twenty minutes at Westchester, Robinson asked Ferguson, "What do you want?" Ferguson testified that he informed Robinson that because Robinson's attorney

---

[4] (...continued)
in 2008 appears in the record. Agent Ferguson testified, however, that Robinson was not the primary target in 2003, and Robinson implicated several individuals in his statement. Perhaps if he was not the primary target, the police first pursued the people whom he implicated.

had invoked Robinson's right to counsel, a *Miranda* waiver was required before they could discuss the investigation. At 8:41 p.m., Robinson signed a *Miranda* waiver; at 11:15 p.m. he made changes to and signed a handwritten statement implicating himself and several others in the gun trafficking conspiracy for which he was later convicted.

In his testimony at the evidentiary hearing, Robinson claimed that his attorney was told not only that the outstanding warrant for his arrest originated out of Lombard, but that the officers were going to take him to the Lombard Police Department. Robinson also claimed that the officers began questioning him during the ride to Westchester, continued interrogating him once they arrived at the police station, and told him that he did not need an attorney. Robinson testified that he signed the incriminating statement at 11:15 p.m. "to get out of there" and backdated the *Miranda* waiver to 8:41 p.m. at the instruction of Agent Bowes.

The district court denied Robinson's motion to suppress after finding that, although the question was close, Robinson—not the police officers—reinitiated the conversation about firearms trafficking at the Westchester Police Department. The district court found the evidence of Robinson's history of talking to law enforcement especially convincing and concluded that Robinson initiated the conversation because he was confident he could talk his way out of any trouble.

At trial, Robinson's 2003 statement was published to the jury and read out loud by Agent Ferguson during

his testimony. The jury convicted Robinson on both counts of the indictment. The district court sentenced Robinson to two consecutive terms of 60 months of imprisonment and 36 months of supervised release. On appeal, Robinson challenges the district court's denial of his motion to suppress.

## II. Discussion

Robinson argues that his statement should have been suppressed and that, because the jury was allowed to consider this evidence, we should reverse his conviction. We review the district court's factual findings on a motion to suppress for clear error and its legal conclusions de novo. *United States v. Burks*, 490 F.3d 563, 565 (7th Cir. 2007).

Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a suspect must be informed of, and voluntarily waive, his right to counsel before being subjected to custodial interrogation. A waiver of the right to counsel is valid only if, under the "totality of the circumstances," the waiver was knowing and voluntary. *Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981). Once a suspect has informed the police that he wishes to consult with a lawyer, all interrogation of the suspect must cease "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. A suspect initiates conversation if he makes a statement that "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*,

462 U.S. 1039, 1046 (1983). By itself, a suspect's initiation of conversation does not necessarily constitute a waiver of his right to counsel; the suspect's waiver must also be knowing and voluntary, under the totality of the circumstances, before law enforcement agents engage in any interrogation. *Edwards*, 451 U.S. at 486 n.9.

Robinson claims that the district court erred in finding that he reinitiated the conversation that resulted in his incriminating statement. Specifically, he argues that under the "totality of the circumstances" he could not have reinitiated conversation with the agents. Robinson claims that the officers first violated *Edwards* by deceiving him by telling him he was going to the Lombard police station but instead taking him to Westchester. He claims this diversion was done with the intention of eliciting an incriminating statement and that, but for the diversion to Westchester, he would not have made the incriminating statement.[5] Therefore, he now insists, his subsequent initiation of a conversation with the police was not valid.

Robinson argues that the question of whether or not he initiated the conversation is subject to de novo

---

[5] Robinson claims that had he been taken to Lombard, his mother would have somehow prevented him from giving a statement. This argument ignores two facts: first, he initiated conversation during the processing of the warrant, and could not, in any event, have been released until after the warrant was processed; second, he initiated conversation and signed the *Miranda* waiver twenty minutes before his mother telephoned the Lombard station to inquire about his status.

review. Not so. The so-called "totality of the circumstances" test addresses the distinct question of whether a *Miranda* waiver was voluntary and knowing. While that is a legal question subject to de novo review, the district court's underlying findings of fact, including the necessary fact that a suspect initiated the conversation with law enforcement agents, are reviewed for clear error.[6] *Bradshaw*, 462 U.S. at 1046-47; *see also Edwards*, 451 U.S. at 486 n.9.

Of course, if the officers' conduct prior to the point when Robinson initiated further conversation amounted to interrogation, such interrogation would have violated *Edwards* and rendered the subsequent initiation and waiver invalid. But whether police officers intended to elicit a suspect's statement is not, as Robinson claims, the standard for interrogations under the Fifth Amendment. Rather, absent direct interrogation, the officers did not violate Robinson's Fifth Amendment right to counsel unless they should have known that the practices they employed were "reasonably likely to elicit an incriminating response" from Robinson. *Rhode Island*

---

[6] There is no doubt that, under the facts as found by the district court, Robinson's unprompted question, "What do you want?" was sufficient under *Edwards* to initiate a conversation. *See Bradshaw*, 462 U.S. at 1045 (upholding a finding of initiation where defendant had asked, "Well, what is going to happen to me now?").

*v. Innis*, 446 U.S. 291, 301(1980).[7] As this court has interpreted this test, there is no violation unless "a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (citations omitted); *United States v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997).

Here, the district court found that Robinson was not directly interrogated by Agent Ferguson, and the surrounding facts do not suggest the type of coercive practices that are the "functional equivalent" of interrogation. *See Innis*, 446 U.S. at 301. At most, the police caused a slight delay in processing Robinson on the retail theft warrant due to a delay in getting necessary information from Lombard. But a short delay—in this case probably less than half an hour—is not "reasonably likely" to cause a suspect to make incriminating statements, even with the attendant hope that a suspect will act against his own interests, initiate a conversation, and incriminate himself. Nor did the police isolate Robinson from his attorney. In fact, the diversion and delay did not actually deprive Robinson of his attorney's presence or advice. Allen did not attempt to accompany or follow Robinson to the police station. He was

---

[7] This does not mean that the police officers' intent is necessarily irrelevant, as it might bear on whether they should have known that their actions were likely to elicit an incriminating response. *Innis*, 446 U.S. at 301-02 n.7.

equivocal regarding whether he planned to go to the station at all that evening, as he was not representing Robinson on the retail-theft charge, and did not, in fact, make any further efforts on Robinson's behalf that evening.

The district court found that less than an hour after he left his attorney, Robinson disregarded his attorney's advice and initiated a conversation with the police. Given this finding, we see no reason to believe that Robinson would not have given the same statement had he been taken directly to Lombard.

The question before us, then, is whether the district court's factual findings were clearly erroneous. In this case, the district court held a hearing on Robinson's motion to suppress and heard testimony from virtually everyone involved with his arrest, processing, and confession. After weighing the credibility of the witnesses and considering Robinson's history of cooperating and otherwise voluntarily conversing with law enforcement, the district court found that the agents' story, rather than Robinson's, was credible and that Robinson had reinitiated the conversation that led to his *Miranda* waiver and subsequent confession.

Where a factual finding rests on the district court's credibility determination, it "is entitled to great deference and can virtually never be clear error." *United States v. Clark*, 538 F.3d 803, 813 (7th Cir. 2008) (citations omitted). Robinson correctly states that a district court finding is clearly erroneous if it credits exceedingly improbable testimony, such that we are left with the definite and firm conviction that a mistake has been made. *See Burks*,

490 F.3d at 565. He cites contradictions between what Agent Ferguson and Agent Gainer testified about what they told Robinson concerning which police station he would be taken to for booking. He also references variations in the minor details describing events that occurred at the Westchester Police Department. Cumulatively, he claims these inconsistencies made the officers' testimony exceedingly incredible, especially in light of Robinson's clear assertion of his right to counsel. Noting that the district court found the question of who initiated the conversation "close," Robinson invites us to revisit the factual question and reverse.

The types of minor inconsistencies between Gainer's and Ferguson's testimonies that Robinson identifies are hardly indicative of clear error. Indeed, he could be just as skeptical of whether the agents were telling the truth if there were no inconsistencies, considering nearly five years had passed between the arrest in 2003 and the evidentiary hearing in 2008. In any event, what Robinson was told at his mother's house, and where he thought he was heading when he got in the police car have no bearing on whether he initiated the conversation about firearms when he arrived at Westchester. It is perhaps odd that having anticipated the need to retain an attorney and clearly asserting his right to counsel, Robinson so quickly disregarded his attorney's advice and confessed his involvement with the gun trafficking conspiracy. Whatever doubt that this unusual twist may have raised was likely outweighed by the district court's recognition of Robinson's demonstrated propensity to chat with law enforcement agents and his belief that he

could talk his way out of any sort of trouble. That the district court found the issue close only demonstrates that it carefully weighed the evidence and made a reasonable finding. The district court believed the testimony of Agents Ferguson and Gainer, and we refuse to second-guess that finding.

### III. Conclusion

The district court did not commit clear error in finding that Robinson initiated conversation with law enforcement. Therefore, the law enforcement agents did not interrogate Robinson in violation of his Fifth Amendment right to counsel, and the district court properly denied Robinson's motion to suppress his incriminating statements. Accordingly, we AFFIRM the district court's judgment.