In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 21-2811 & 22-1003

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KHALIL M. JACKSON,

*Defendant-Appellant.*

———————————

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:20-cr-00076-DRL-MGG-1—**Damon R. Leichty**, *Judge.*

———————————

ARGUED NOVEMBER 29, 2022 — DECIDED JUNE 16, 2023

———————————

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. A jury found defendant-appellant Khalil Jackson guilty on charges of sex-trafficking a minor ("Jane Doe"), child pornography, and cyberstalking. On appeal Jackson seeks a new trial on two grounds. First, he contends the district court erred by denying his motion to suppress incriminating statements he made to police in his first interview with them. Second, he contends he was entitled to

a jury instruction limiting the use of voicemails in which he threatened Doe and her family. Finding no error, we affirm.

I.   *Factual and Procedural Background*

A.   *Jackson's Trafficking of Doe*

Jane Doe's story illustrates how human traffickers prey on their victims. See generally *United States v. Jackson*, 535 F. Supp. 3d 809 (N.D. Ind. 2021) (ruling on motions in limine, including on government's proposed expert on tactics and effects of human trafficking). After Doe's father went to prison for child molesting, she was raised by her mother and grandparents. Doe often felt alone. When she was seventeen years old, her sister introduced her to Khalil Jackson, then twenty-four years old. Knowing that Doe was a survivor of sexual assault, Jackson assured Doe that she was "his best friend," that he was going to "protect" her, and that "he was never going to let anybody touch" her again. Jackson pursued a relationship with Doe and tried to undermine her relationship with her family. He eventually helped her run away from home.

When Doe was still seventeen, Jackson coaxed her into prostitution for his benefit, picking up customers at gas stations, truck stops, and driveways, then taking them to apartments, houses, and hotel rooms as arranged by Jackson. Taking the trafficking to a new level, Jackson began advertising Doe's services online, using nude photos of her and a video of Jackson himself having sex with her. Jackson eventually transported Doe across a state line for multiple encounters in Michigan for more prostitution.

B.   *Doe Eventually Escapes*

Doe tried to run away, but wherever she went, Jackson always seemed to be watching. He prevented her from calling

her mother, destroyed her cell phone, and beat her more times than Doe could count. Eventually, though, Doe's friends and family intervened. A family friend posted on social media that the FBI was investigating Jackson. When Jackson discovered this, Doe later testified, he "started freaking out," said he feared "the cops are coming," and took Doe to a different hotel where "the cops weren't looking." Then, Jackson beat Doe and dragged her from his car, by her hair, into the road. A friend saw her and took her home. Doe's mother called the police and took her to the hospital. Doe was bruised, bloodied, and in a neck brace. Doe spoke with police while in the hospital but was too afraid of Jackson to report the trafficking.

Jackson then made threatening phone calls to Doe's family home. After Doe's family stopped picking up the phone, Jackson left threats on voicemails. Three were eventually played for the jury. He threatened to make people pay, to shoot up the place, and to burn down the house. Doe and her family took the threats seriously. Doe herself, who was familiar with Jackson's prior threats and beatings, was frightened to tears. Doe's grandfather was so frightened, he testified, that he feared Jackson would "torch the house" while the family was sleeping and burn them all alive.

C. *The Police Investigation and Conviction*

Responding to a report about possible human trafficking, Saint Joseph County Detective Phillip Williams interviewed Doe and her family. Doe's grandfather shared Jackson's threatening voicemails. Doe gave Detective Williams the phone numbers related to advertisements on an escort website and a web-based texting app. The police collected records of advertisements connected to those phone numbers. The police also obtained text messages and user data connected to

those phone numbers, as well as evidence from three hotels where Doe was trafficked. The police collected 400 advertisements of Doe for prostitution, including nude photos, many text messages inviting customers to locations for sex, a user email address related to Jackson, and records documenting Jackson checking into three hotels, often with another person.

The police then obtained a search warrant for Jackson's apartment. The police seized one cell phone that revealed over 200 queries to the same escort website already identified, as well as confirmations that advertisements had been uploaded. Detective Williams also interviewed Jackson at his dining room table. Portions of that interview were the subject of Jackson's motion to suppress, discussed below.

A federal grand jury indicted Jackson on five charges: one count of child sex-trafficking, one count of producing child pornography, one count of possessing child pornography, one count of transporting child pornography, and one count of cyberstalking. See 18 U.S.C. § 1591 (child sex-trafficking); 18 U.S.C. §§ 2251–52 (child pornography); 18 U.S.C. § 2261A (cyberstalking). A jury convicted Jackson on all counts. The district court sentenced him to forty years in prison and denied his motion for a new trial.

II. *The Motion to Suppress*

Jackson argues on appeal that the district court should have granted his motion to suppress statements he made during his interview with Detective Williams when his apartment was searched. Jackson sought to suppress evidence that he had a phone number that did not match his seized phone, that he confirmed that he knew the email address and social media details used to prostitute Doe, and that he knew Doe's actual

age. Jackson moved to suppress this evidence on the theory that its use would violate his right to counsel and associated rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1980). *United States v. Jackson*, No. 3:20-CR-00076 DRL, 2020 WL 6537217, at *1 (N.D. Ind. Nov. 6, 2020).

Jackson disclosed the key points from the interview—his phone number, his email, his social media contact, and his knowledge of Doe's age—after he had been given *Miranda* warnings. Earlier in the interview, however, Jackson had told Detective Williams he would "rather have a lawyer." *Id.* Jackson contends that his "rather have a lawyer" statement was sufficient to invoke his right to counsel, so that the continued questioning violated his rights.

A.  *A Suspect's Miranda Rights*

To protect a criminal suspect's privilege against compelled self-incrimination and right to counsel, the suspect "must be informed of, and voluntarily waive, his right to counsel before being subject to custodial interrogation." *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009), citing *Miranda*, 384 U.S. at 444. Once a suspect informs the police that he wants to consult with a lawyer, all interrogation must cease "until counsel has been made available to him." *Edwards*, 451 U.S. at 484–85. If the suspect's request for counsel is ambiguous or equivocal, though, "officers have no obligation to stop questioning him." *Davis v. United States*, 512 U.S. 452, 461–62 (1994). *Davis* advised that "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney," but the Court stopped short of holding that the Constitution requires officers to ask clarifying questions. *Id.*

When a suspect has clearly requested counsel, *Edwards* holds that police must stop the interrogation, but *Edwards* also teaches that a suspect may open the door to further interrogation if the suspect himself initiates further communications with the police. 451 U.S. at 484–85. A suspect initiates further communication if he makes a statement demonstrating "a willingness and a desire for a generalized discussion about the investigation," and "not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983). If a suspect initiates conversation again, that fact by itself "does not necessarily constitute a waiver of his right to counsel." *Robinson*, 586 F.3d at 545. Before police may engage in an interrogation, the suspect's waiver must also be "knowing and intelligent and found to be so under the totality of the circumstances." *Edwards*, 451 U.S. at 486 n.9.

We review de novo whether the defendant invoked his right to counsel. *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006). We review for clear error the factual questions whether "the accused, not the police, reopened the dialogue with the authorities" and whether a *Miranda* waiver was knowing and intelligent. *Edwards*, 451 U.S. at 486 n.9, cited in *Robinson*, 586 F.3d at 544–45 (reinitiation was factual issue); *Perri v. Director, Dep't of Corrections*, 817 F.2d 448, 451 (7th Cir. 1987) (knowing and intelligent waiver was factual issue). We review de novo whether such a reinitiation and a knowing and intelligent waiver were voluntary "under the totality of the circumstances." *Robinson*, 586 F.3d at 545.

B.  *The Detective's Interview with Jackson*

The recording of Detective Williams' interview with Jackson shows he arguably invoked his right to counsel, but even

if he did, he then immediately opened the door for further interrogation by reinitiating conversation. Early in the interview, before reading *Miranda* warnings, the detective told Jackson that he was going to explain his rights to him. The detective also said he wanted to talk to Jackson. Jackson responded twice through crosstalk that he would "rather" talk to a lawyer, including responding to a direct question about whether he wanted to talk to the detective:

| | |
|---|---|
| Detective**:** | I'm gonna advise you of your rights. I'm gonna explain to you why we're here, ok. I want to talk to you. I'm gonna ask you not to lie. We are federal officers. If you lie to us, that's a crime in itself, and it's not like on the state side where— |
| *Jackson*: | I'd just rather have a lawyer— |
| Detective: | Okay |
| *Jackson*: | —cause you guys are taking me to jail. |
| Detective: | You don't want to talk to me at all? |
| *Jackson*: | I just, I'd rather talk to a lawyer. You guys are taking me to jail. What is there more I can do to help myself? |

In denying Jackson's motion to suppress, the district court wrote that, standing alone, "I'd rather have a lawyer" would "fall somewhere between the unambiguous request of 'can I

have a lawyer' and the ambiguous statement 'maybe I should get a lawyer.'" *Jackson*, 2020 WL 6537217, at \*2. The district court went on to conclude that Jackson's following question— "What is there more I can do to help myself?"—made the "rather have a lawyer" statement ambiguous. *Id.* at \*3. The district court found in this phrasing the "passive ambiguity" of Melville's Bartleby the Scrivener and focused on the contraction "I'd" for "I would rather have a lawyer," in the "second conditional tense," which the court understood as expressing perhaps only a "conditional preference." *Id*. at \*2–3.

We are less confident than the district judge was that Jackson chose his verb tense to address an unrealistic or unlikely scenario, as strict grammarians might use that tense. The detective was interrogating Jackson right then and there. Jackson had to make an immediate decision about whether to exercise his *Miranda* rights. In past cases, we have treated nearly identical expressions as sufficient to invoke the right to counsel. See *United States v. Martin*, 664 F.3d 684, 687, 689–90 (7th Cir. 2011) (defendant's statement that "I'd rather talk to an attorney first" before providing written statement was unambiguous request for counsel but was limited to providing written statement; request for counsel did not apply to answering questions orally); *White v. Finkbeiner*, 611 F.2d 186, 190 (7th Cir. 1979) ("I'd rather see an attorney" held to be a request for counsel), quoting *Miranda*, 384 U.S. at 444–45 ("If [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."); see also *United States v. Hill*, 575 F. Supp. 3d 185, 195–96 (D.D.C. 2021); *United States v. Espinal-Cardona*, 635 F. Supp. 330, 333 (D.N.J. 1986); *State v.*

*Munson*, 594 N.W.2d 128, 139 (Minn. 1999); *Booker v. State*, 851 P.2d 544, 547 (Okla. Crim. App. 1993).[1]

Nevertheless, we recognize that the district court was trying to parse a very fast exchange between Jackson and the detective. In the critical moments, both were sometimes talking at once. Jackson barely took a breath between saying he would rather have a lawyer and then asking: "What is there more I can do to help myself?" As we explain next, that question had the legal effect under *Miranda* and *Edwards* of opening the interrogation back up, so in the end, we can decide this appeal without deciding whether "I'd rather have a lawyer" was or was not ambiguous under all the circumstances.

C. *Jackson's Reinitiation*

"What is there more I can do to help myself?" Jackson characterizes this phrase as a statement. The detective understood it as a question. It sounded like a question to the district court, and it sounds like a question to us, too. Whether a statement or a question, though, Jackson initiated "further communication, exchanges, or conversations with the police,"

---

[1] Our *White* opinion had a long subsequent history concerning White's later initiation of further questioning, but the later opinions did not question treating "I'd rather see an attorney" as a sufficient request for counsel. The cited opinion was vacated for reconsideration in light of *Edwards v. Arizona*. *White v. Finkbeiner*, 451 U.S. 1013 (1981). Our decision on remand, 687 F.2d 885 (7th Cir. 1982), was also vacated, that time for further consideration in light of *Solem v. Stumes*, 465 U.S. 638, 643 (1984), which held that *Edwards* was not retroactive. *Fairman v. White*, 465 U.S. 1075 (1984). In the *White* case's fourth visit to this court, *White v. Finkbeiner*, 753 F.2d 540, 545 (7th Cir. 1985), we ultimately denied habeas relief for White but did not question whether he had initially invoked his right to counsel sufficiently by saying he would "rather see an attorney."

*Robinson*, 586 F.3d at 545, and the detective did not provoke him to do so.

The detective was then free to seek clarity on whether this was a knowing and voluntary waiver. *Davis*, 512 U.S. at 461. The detective told Jackson there were "two sides to every story." Jackson said, "I know that," and continued talking. He complained that people were jumping to conclusions over the social media post by Doe's family friend. He wondered aloud why he was only now learning he was being investigated. And he argued with the detective about the battery case against him (when his beatings had sent Doe to the hospital), and why he was not being told why he was being arrested. At several points in the next few minutes, the detective explained to Jackson that he did not have to answer questions and could speak with an attorney. Jackson said he understood. For example:

> Detective: I was getting ready to tell you and explain all that to you and you said you wanted an attorney. Now, if you want an attorney, that's fine. If you want to talk to me, you can talk to me. And if we get to a question you don't want to answer, don't answer it.
>
> *Jackson*: I understand that.

The detective later explained: "There's always two sides to every story. If you have information that can exonerate you, give it to me. I'll investigate it. It's just as much my job to prove that you're innocent, if you're saying you're innocent, as that

you're guilty." The detective said: "If you want to talk to me and explain your side, fine. If you want an attorney, that's fine too." Jackson continued to complain that he had go to jail "without knowing" whether "you guys might find something incriminating." The detective tried to clarify: "Do you want me to read your rights, or do you want to answer any questions at all, or would you prefer at this point to have a lawyer?" This was met with no direct answer.

After these multiple attempts at clarification, the detective tried to clarify once more whether Jackson was willing to talk. Jackson agreed to keep talking:

| | |
|---|---|
| Detective: | Are you saying you're willing to talk to me? I need you to be clear on that. |
| *Jackson*: | I just wanna know what's—of course I'm willing to talk to you. |

Jackson then complained that the only time he had been to jail was when he had done something illegal. Moments later, the detective read Jackson his full *Miranda* warnings, which Jackson said he understood.

After those warnings, Jackson made the incriminating admissions he argues should have been suppressed: a phone number that did not match his seized phone, as well as his email address and his social media profiles. He also admitted that he knew Doe had turned eighteen only recently. Thirty minutes after the conversation started, Jackson finally said, "I want a lawyer now." Jackson made no further admissions.

We agree with the district court's alternative holding that, if Jackson's "I'd rather talk to a lawyer" statement invoked his

*Miranda* rights, then under the totality of the circumstances, Jackson knowingly and voluntarily waived his right to counsel during the interrogation by immediately initiating "further communication, exchanges, or conversations with the police." *Jackson*, 2020 WL 6537217, at *3, citing *Edwards*, 451 U.S. at 484–85. Jackson continued asking the detective questions about the warrant and charges against him. Even after the detective several times informed Jackson that he did not have to talk to him, Jackson still said, "I understand that" and "of course I'm willing to talk to you." See *Perri*, 817 F.2d at 452 (defendant understanding the questions "sufficient to find valid waiver"). Jackson initiated further conversation and knowingly, intelligently, and voluntarily waived his right to counsel.

Jackson argues that the detective provoked him into disclosing his cell phone number, email address, and social media profiles, citing, for example, *United States v. Wysinger*, 683 F.3d 784, 801 (7th Cir. 2012), where we held that officers improperly continued a custodial interrogation after the suspect had invoked his right to counsel. Unlike the circumstances in *Wysinger*, though, Jackson's admissions were not provoked. Jackson was the person who kept the conversation going after saying he would rather talk to an attorney. The district court did not err by denying Jackson's motion to suppress his admissions about his email address, his phone number and social media profiles, or his knowledge that Doe had been a minor when he was trafficking her.[2]

---

[2] After Jackson said, "I want a lawyer now," the detective tried to provoke him into continuing to answer questions. Jackson said nothing

D. *Harmless Error*

Even if we assume Jackson unambiguously asserted his right to counsel with his statement that he would rather have a lawyer, and even if he had not reinitiated the interrogation, we are also satisfied that any constitutional error would have been harmless. The interrogation did not produce a confession to the crimes. It produced admissions of three pieces of information: that Jackson used another phone number that did not match his seized phone, that he knew the email address and social media details used to prostitute Doe, and that he knew Doe's actual age. This evidence was helpful to the prosecution, but it was not decisive in the trial. Without those details, the rest of the evidence against Jackson was still simply overwhelming: hundreds of visits to the escort website, hundreds of advertisements of Doe for prostitution, including nude photos and the video of Jackson himself having sex with Doe, many text messages inviting customers to locations for sex, direct documentation of hotel check-ins, and direct testimony from Doe herself describing Jackson's trafficking, beatings, and pornography, from gas stations to driveways to apartments, from hotels to cars to truck stops, and from Indiana to Michigan to the internet. We are convinced that any arguable constitutional error in denying the motion to suppress was harmless beyond a reasonable doubt.

III. *The Limiting Instruction Issue*

At trial the court admitted into evidence three voicemail recordings of Jackson's threats to Doe's family. These voicemails were properly admitted to prove the cyberstalking

---

further of any substance, and no responses to those provocations were admitted against Jackson at trial.

charge. Jackson asked the court for a limiting instruction tell-ing the jury to consider the voicemails only on that charge. The district court denied that request. We find no error.

On appeal, Jackson argues that, with respect to the hu-man-trafficking and child-pornography charges, the threaten-ing voicemails were "other acts," inadmissible under Federal Rule of Evidence 404. That rule governs character evidence and evidence of a person's other acts not directly at issue in the trial. Rule 404(b)(1) provides: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." If character is not the *only* purpose of other-acts evidence, Rule 404(b)(2) al-lows some use of evidence of other bad acts for specific pur-poses in criminal cases. The Rule mentions motive, oppor-tunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident. If the evidence of other acts is admitted for one of those purposes, a defendant who re-quests a limiting instruction is entitled to one. *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) (en banc).

When evidence is admissible for one purpose but not an-other, "the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105. The decisive question here is whether the district court abused its discretion in treating the threatening voicemails as relevant to the human-trafficking and child-por-nography charges. See *United States v. Mokol*, 646 F.3d 479, 483–84 (7th Cir. 2011).[3]

---

[3] Jackson's first request for a limiting instruction did not specifically invoke Rule 404, and the prosecutor said the voicemails were "an example

We find no abuse of discretion. Jackson's threatening voicemails were evidence of witness intimidation. They were direct evidence to prove the human-trafficking and child-pornography charges, so Rule 404(b) does not apply here. "[C]onduct taken for the purpose of thwarting discovery of the crime or postponing the investigation of the crime *is* part of the charged crime." *United States v. Bowling*, 952 F.3d 861, 869 (7th Cir. 2020). This category of evidence includes attempts to threaten witnesses, potential witnesses, or people cooperating with a government investigation of the charged conduct. See *United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002); accord, e.g., *United States v. Carson*, 870 F.3d 584, 599–601 (7th Cir. 2017) (defendant's threats to victims of sex trafficking were direct evidence of crime, not subject to Rule 404(b)); *Mokol*, 646 F.3d at 483–84 (threats to prosecution witness were direct evidence, not subject to Rule 404(b)), quoting *United States v. DeAngelo*, 13 F.3d 1228, 1232 (8th Cir. 1994); see also *United States v. Balzano*, 916 F.2d 1273, 1280–82 (7th Cir. 1990) (defendant's threat to cooperating witness was direct evidence of other charges, not subject to severance for separate trials).

Jackson left the voicemail messages only after Doe had made her escape and after he committed his child-pornography offenses. He contends this timing means the evidence of his threats could be evidence of human trafficking and child

---

of his *character*." Dkt. Entry 101 at 349 (emphasis added). The district judge responded to that bobble by clarifying that the prosecutor intended to use the voicemails "as reflective of his conduct in the past that was used to coerce her on the other counts." Given the prosecutor's reference to character, which the rule prohibits, Jackson's request was sufficiently clear to preserve the issue for appellate review. See Fed. R. Evid. 103(a)(1)(B) (evidence objection may be preserved if ground "was apparent from the context"); see also *United States v. Holt*, 460 F.3d 934, 936–37 (7th Cir. 2006).

pornography only on a propensity or bad-character theory. Similar timing arguments could have been made in *Carson*, *Mokol*, and *Balzano*. A threat to a witness to a crime is admissible as direct evidence of that crime, even if, or especially if, the threat is made after the crime is committed.

Jackson also argues that the district court should have issued a limiting instruction on the theory that, without such instruction, the danger of unfair prejudice substantially outweighed the probative value of the evidence. Federal Rule of Evidence 403 gives the trial judge discretion to exclude relevant evidence "if its probative value is substantially outweighed by a danger" of unfair prejudice. "Unfair prejudice" includes "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* 1972 Advisory Committee Notes. We assume for purposes of argument that the rationale of Rule 403 may extend to a call for a limiting instruction where admissible evidence may pose a high risk of unfair prejudice if used for a particular purpose.

As a general proposition, we recognize that evidence of a defendant's threats to witnesses may pose a danger of unfair prejudice. Threats are a "striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996), quoting *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986). Nevertheless, reliable evidence of threats can be probative of a defendant's consciousness of guilt, and we see nothing *unfairly* prejudicial in admitting threats that defendant Jackson intentionally recorded to try to

prevent his prosecution and conviction. Cf. *United States v. Calabrese*, 572 F.3d 362, 368–69 (7th Cir. 2009) (finding no abuse of discretion in admitting recording of defendant's warnings to cooperating witness, including sounds of beatings).

Finally, the jury was also given standard instructions to "consider each charge and the evidence concerning each charge separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any other charge." The jury heard these instructions at the beginning of the trial and at the end. As we said in *Balzano*, *Mokol*, and *Calabrese*, we assume juries hear, understand, and follow such instructions. *Balzano*, 916 F.2d at 1282; *Mokol*, 646 F.3d at 487; *Calabrese*, 572 F.3d at 368–69. The district judge did not abuse his discretion in treating the threats as relevant to the sex-trafficking and child-pornography charges, and thus in denying Jackson's request for a limiting instruction.

From start to finish, Judge Leichty did an excellent job with this challenging case. It is telling that the appeal raises only these two issues. The judgment of the district court is AFFIRMED.