# Supreme Court of Florida

---

No. SC2022-0458

---

**STATE OF FLORIDA,**
Petitioner,

vs.

**ZACHARY JOSEPH PENNA,**
Respondent.

May 2, 2024

GROSSHANS, J.

We accepted for review a decision of the Fourth District Court of Appeal that ordered suppression of certain statements made by Zachary Penna, concluding that police obtained those statements in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966). *See Penna v. State,* 344 So. 3d 420 (Fla. 4th DCA 2021). At the request of the State, the district court certified a question to us involving the requirements of *Miranda* as interpreted by *Shelly v. State,* 262 So. 3d 1 (Fla. 2018). In particular, the district court asked if *Miranda* is "automatically violated" when an officer does not "re-read a *Miranda*

warning following a defendant's voluntary re-initiation of contact" with law enforcement. *Penna*, 344 So. 3d at 442 (on motion for certification). We answer that question in the negative and recede from our decision in *Shelly*, which announced a per se rule that is inconsistent with U.S. Supreme Court precedent.[1]

I

In 2015, Penna unlawfully entered a home in Palm Beach County and brutally stabbed two men to death when they refused his demand for their vehicle. The force and number of stabbings caused significant bloodshed throughout the home. Penna, covered in the victims' blood, scooped up some blood and drank it.

After stabbing the two men, Penna took their SUV, drove to a nearby neighborhood, and robbed an elderly woman. Moments later, Penna kidnapped a coworker from his home, but he was able to escape when Penna stopped at a restaurant.

Undaunted, Penna drove north to Brevard County where he abandoned the SUV. After locating another vehicle, he approached the owner and demanded the keys. When the owner did not fully

---

1. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const.

comply with his directives, Penna slashed the man's throat with a knife.[2]  Then, Penna fled into the woods.

Responding to the attack, law enforcement deployed a canine that successfully located Penna.  Penna stabbed the canine and then ran out of the woods with a knife in hand.  Officers ordered Penna to drop the knife, but he refused.  Only after being shot four times did Penna stop charging at the officers.

Following his apprehension, Penna was transported to a nearby hospital where he received medical treatment.  The next day, Detective Jonathan D'Angelo went to the hospital to speak with Penna.  At that time, Penna was shackled to his bed and on several medications.  Despite his physical condition, Penna was able to communicate with the detective.

At the outset of their conversation, Detective D'Angelo asked Penna if he had been advised of his *Miranda* rights.  In response, Penna began listing those rights, noting the right to silence and an attorney.  Despite this, the detective read Penna the *Miranda* warnings as listed on his department-issued card.

---

2.  This victim survived Penna's attack.

Detective D'Angelo then began asking questions related to the murders. Penna answered the first few questions, generally denying that he recognized the murder victims or their home. But when Detective D'Angelo asked Penna how he came to have possession of the stolen SUV, Penna invoked his right to counsel. At that point, Detective D'Angelo stopped questioning Penna and left the room. When another detective entered Penna's room later that day, Penna again invoked his right to counsel.

Following these interactions with law enforcement, Penna remained in a hospital for roughly a month and a half, always restrained to his bed. During this time, at least one officer was assigned to constantly monitor him.

One of the assigned officers was Deputy Michael Nettles, who started monitoring Penna roughly four weeks after the murders. One day, Penna asked Deputy Nettles why he (Penna) was in the hospital. Deputy Nettles responded by saying, "[Y]ou don't know why you're here?" A short time later, Penna volunteered to Deputy Nettles that he had "stabbed a couple of people." In response to a clarifying question, Penna confessed to stabbing a police dog and confirmed that he had stabbed two men.

Two days later, Deputy Nettles was again assigned to monitor Penna. Without prompting, Penna stated that he was in a poor mood and that his life was messed up. Deputy Nettles followed up by asking why Penna had this dim outlook. Penna responded that he had ruined his own life, adding: "I know what I did. I'm going to prison for my whole . . . life."

The very next day, Deputy Nettles was again assigned to watch Penna. While talking with Deputy Nettles, Penna asked, "What do you think I will get?" Penna clarified that he meant for "killing th[e] two [men]." Redirecting that question, Deputy Nettles asked Penna what he thought his punishment would be for the crimes. At that point, Penna told Deputy Nettles that he would share what happened. Deputy Nettles reminded Penna that he was an officer and would write down his statements. In addition, Deputy Nettles also cautioned Penna against talking unless he wanted to. Deputy Nettles, though, stopped short of giving *Miranda* warnings to Penna. Penna proceeded to offer additional details about his crime spree.

Roughly a week later, Penna again struck up a conversation with Deputy Nettles. During that conversation, Penna once more

spoke of his crimes and said that he thought the murders would result in life sentences.

The final relevant conversation with Deputy Nettles occurred roughly two weeks later. In addition to mentioning expected criminal sanctions, Penna spoke of being reborn and his belief in the Egyptian god Ra. Alluding to his anticipated prosecution, Penna said that he would testify that Ra told him to do things.

Ultimately, the State charged Penna with several crimes, including two counts of first-degree murder. Before trial, Penna moved to suppress the statements made to Deputy Nettles, arguing that such statements were obtained in violation of *Miranda.* The trial court held a hearing on the motion at which Detective D'Angelo and Deputy Nettles testified. Among other things, Deputy Nettles testified about his conversations with Penna and the circumstances surrounding those conversations. Following the evidentiary hearing, the trial court denied the motion in its entirety, stressing that Penna initiated all the conversations with Deputy Nettles. Thus, in the court's view, Penna had failed to establish a *Miranda* violation.

At the ensuing trial, the State presented substantial physical evidence and witness testimony to establish Penna's guilt. One of its witnesses was Deputy Nettles. Through his testimony, the State presented many of Penna's incriminating statements. After the State rested, Penna introduced evidence to support his insanity defense. Rejecting that defense, the jury found Penna guilty as charged on all counts. The court entered judgment consistent with the verdicts and sentenced Penna to life in prison.

Penna appealed to the Fourth District. At the outset of the majority opinion, the district court rejected what it characterized as the parties' "all or none" approach. *Penna*, 344 So. 3d at 431-32. It found that the statements during the first two conversations were not obtained in violation of *Miranda*. According to the majority, such statements were not the products of police interrogation, i.e., they were either spontaneous or made in response to clarifying questions. *Id.* at 434-36. However, partially agreeing with Penna, the majority found that Deputy Nettles violated *Miranda* by failing to "specifically" give Penna "his *Miranda* rights again" prior to custodial interrogation during the final three conversations. *Id.* at 436-38. In support of that conclusion, the majority relied on its

own precedent, *see Quarles v. State*, 290 So. 3d 505 (Fla. 4th DCA 2020), which had interpreted our decision in *Shelly* to require a full rereading of *Miranda* warnings under the circumstances of this case. *Penna*, 344 So. 3d at 434 (discussing *Quarles*). The majority went on to find that the error was not harmless, despite acknowledging the overwhelming evidence of Penna's guilt. *Id.* at 438-39.

Judge Artau agreed that *Quarles* compelled a finding that *Miranda* was violated. *Id.* at 440-41 (Artau, J., concurring in part and dissenting in part). But in his view, any error was harmless in light of the overwhelming evidence of guilt. *Id.* at 441-42. He also questioned whether *Shelly* was correctly decided, though his doubts about that case were not the basis of his partial dissent. *Id.*

Following issuance of the district court's decision, the State asked the court to certify a question of law to us. Granting that request, the district court certified the following question as being of great public importance, asking:

> WHETHER A DEFENDANT'S FIFTH AMENDMENT *MIRANDA* RIGHTS ARE AUTOMATICALLY VIOLATED WHEN AN OFFICER FAILS TO RE-READ A *MIRANDA* WARNING FOLLOWING A DEFENDANT'S VOLUNTARY RE-INITIATION OF CONTACT.

Based on that certified question, we granted the State's request for review.

II

The certified question presents us with a pure legal issue. As such, our standard of review is de novo. *See City of Tallahassee v. Fla. Police Benevolent Ass'n, Inc.*, 375 So. 3d 178, 183 (Fla. 2023). In undertaking this review, we first discuss background legal principles and then analyze our decision in *Shelly* against that backdrop.

In *Miranda v. Arizona*, 384 U.S. at 467-69, the U.S. Supreme Court held that, in order to safeguard the Fifth Amendment's right against compelled self-incrimination, police must advise suspects of certain rights—including the right to silence and counsel—before subjecting them to custodial interrogation. *See Andrew v. White*, 62 F.4th 1299, 1333 (10th Cir. 2023) (noting *Miranda*'s recognition of such rights); *Dickerson v. United States*, 530 U.S. 428, 439-40 (2000) (characterizing *Miranda* as being founded on Fifth Amendment's prohibition against compelled self-incrimination). When a suspect unequivocally invokes the *Miranda* right to counsel,

the officers must immediately stop questioning the suspect. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, that invocation does not mean that law enforcement may never again question the suspect in a custodial setting. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion).

Viewed collectively, *Edwards* and *Bradshaw* establish a two-part test for assessing whether post-invocation statements violate *Miranda*. First, the defendant must reinitiate contact with police. *See Edwards*, 451 U.S. at 486 n.9; *Bradshaw*, 462 U.S. at 1044. And second, there must be a valid waiver of the *Miranda* rights already invoked. *Edwards*, 451 U.S. at 486 n.9; *Bradshaw*, 462 U.S. at 1046. This waiver prong depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Bradshaw*, 462 U.S. at 1046 (quoting *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979)).

We relied on these principles in *Welch v. State*, 992 So. 2d 206 (Fla. 2008). Applying a totality-of-the-circumstances test, we found no *Miranda* violation, specifically noting the factors relevant to our analysis. *Id.* at 214-15 ("[I]f the accused initiates further

conversation, is reminded of his rights, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted." (citing *Bradshaw*, 462 U.S. at 1045-46)).

Ten years later, we again considered a situation where the suspect invoked his *Miranda* rights but made subsequent statements. *Shelly*, 262 So. 3d at 16. We held that the suspect's post-invocation statements were inadmissible under *Miranda.* In finding that *Miranda* violation, we noted that the suspect did not reinitiate contact with police. *Id.* at 17. Under the *Bradshaw-Edwards* analysis, that conclusion would have been enough for a *Miranda* violation.

But we did not confine our analysis to the re-initiation issue. Instead, we discussed *Bradshaw* and *Welch* at length. *Id.* at 11-13. Expanding upon those opinions, we established a categorical rule that an accused must either be "reminded" of his *Miranda* rights or "given" them again—we said both. *Id.* at 13 ("[I]f an accused invokes his or her *Miranda* rights but later reinitiates communication, *an accused must be reminded of his or her Miranda rights* pursuant to this Court's holding in *Welch*."); *id.* ("*Welch*

- 11 -

expands the requirements . . . by specifically including a requirement that the accused be specifically given his or her *Miranda* rights *after an alleged reinitiation*.").

The State argues that *Shelly*'s remind-or-readvise requirement is incompatible with U.S. Supreme Court precedent and urges us to recede from *Shelly* to the extent it adopted that requirement. We think the State's argument has merit.

As our discussion above demonstrates, and as recognized in *Shelly* itself,[3] *Bradshaw* does not state a legal rule that a suspect must always be reminded of or re-given *Miranda* rights following re-initiation of contact with police. *See Shelly*, 262 So. 3d at 22 (Lawson, J., dissenting) (noting that *Bradshaw* did not add "third inquiry" of reminding the suspect of his or her *Miranda* rights). Instead, *Bradshaw* laid out a two-part test that asked whether the defendant reinitiated contact with police and waived his rights as determined by the totality of the evidence. *Id.* Thus, at a

---

3. Specifically, we acknowledged that "the standard is not explicitly stated in *Bradshaw*." *Shelly*, 262 So. 3d at 11. Instead, we looked to "the facts of [*Bradshaw*]" as supporting our conclusion. *Id.*

minimum, *Shelly* improperly expanded *Bradshaw* by adding a new requirement.[4]

The federal courts of appeal are in line with this observation. Circuit courts have consistently interpreted *Bradshaw* and *Edwards* as simply requiring re-initiation by the defendant and a voluntary waiver based on the totality of the circumstances. *See United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989); *Bush v. Warden, S. Ohio Corr. Facility*, 573 Fed. App'x 503, 511 (6th Cir. 2014); *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009); *Lamp v. Farrier*, 763 F.2d 994, 997 (8th Cir. 1985); *United States v. Gonzalez*, 202 Fed. App'x 284, 285 (9th Cir. 2006); *United States v. Willis*, 826 F.3d 1265, 1276-77 (10th Cir. 2016). We note that Penna has not cited a single federal circuit opinion recognizing *Shelly*'s categorical remind-or-readvise requirement.

Having concluded that *Shelly* improperly interpreted Fifth Amendment precedent, we now consider whether stare decisis

---

4. We also note that the *Shelly* court improperly expanded *Welch*, which did not hold that *Miranda* warnings must always be re-given after a suspect invokes his rights. Rather, despite some questionable dicta, *Welch* properly applied a totality-of-the-circumstances test, treating the re-giving of *Miranda* warnings as a significant factor in that analysis.

nevertheless demands our adherence to it. In carrying out this inquiry, we must first consider whether *Shelly* was clearly erroneous. *See State v. Poole*, 297 So. 3d 487, 506 (Fla. 2020). Based on the analysis above, we conclude that our error in *Shelly* was clear. Put simply, the *Bradshaw-Edwards* framework does not include a categorical remind-or-readvise requirement following invocation of *Miranda* rights. Moreover, there is no support in the text of the Constitution or in any U.S. Supreme Court precedent that this one factor is determinative of a Fifth Amendment violation.

Our conclusion that *Shelly* is clearly erroneous does not end the analysis. Pursuant to *Poole*, we also evaluate whether there are any valid reasons for retaining *Shelly*'s remind-or-readvise requirement in our jurisprudence. The critical consideration is reliance. *See State v. Maisonet-Maldonado*, 308 So. 3d 63, 69 (Fla. 2020). "In evaluating reliance interests, courts consider 'legitimate expectations of those who have reasonably relied on the precedent.'" *Id.* (quoting *Ramos v. Louisiana*, 140 S. Ct. 1390, 1415 (2020) (Kavanaugh, J., concurring in part)). Unlike cases "involving property and contract rights," "reliance interests are lowest in cases . . . 'involving procedural and evidentiary rules.'"

- 14 -

*Id.* (quoting *Poole*, 297 So. 3d at 507). Falling into this latter category, *Shelly* announced a rule of criminal procedure that governed police conduct. In our view, detained suspects like Penna are not likely to have substantially altered their dealings with police based on the existence of this one requirement. Penna does not claim otherwise. Accordingly, we conclude that Penna has not identified any significant reliance interests at stake. Nor has he argued any other factor that would justify our adherence to *Shelly*.

For these reasons, we now recede from *Shelly*'s categorical remind-or-readvise requirement. In doing so, we reiterate that *Bradshaw* provides the proper standard which should be applied in this case.[5] That standard asks two things: (1) did the suspect reinitiate contact with police and, if so, (2) did he knowingly and voluntarily waive his earlier-invoked *Miranda* rights. The latter inquiry turns on the totality of the circumstances. We add a final observation. Although we hold that there is no per se requirement

---

5. As best as we can tell, *Shelly* based its categorical rule on the federal constitution. For his part, Penna has not asked us to consider whether a higher standard should be adopted as a matter of Florida constitutional law. *See* art. I, § 9, Fla. Const. ("No person shall . . . be compelled in any criminal matter to be a witness against oneself.").

that an officer remind or readvise a defendant of his *Miranda* rights, evidence of such would certainly be relevant to an overall analysis of whether the defendant voluntarily waived those rights.

III

Based on the reasoning above, we answer the certified question in the negative and quash the Fourth District's decision below, which relied on *Shelly* and its own precedent interpreting *Shelly*.[6] We remand for reconsideration under the proper standard as stated in this opinion.[7]

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

_____

6. Because *Quarles* is inconsistent with this opinion, we disapprove it as well.

7. Since we leave for the district court to apply the *Bradshaw* standard on remand, we have no reason to assess the district majority's harmlessness analysis.

LABARGA, J., dissenting.

In receding from *Shelly*,[8] the majority holds that when a defendant voluntarily reinitiates contact with law enforcement, "there is no per se requirement that an officer remind or readvise [an accused] of his *Miranda*[9] rights." Majority op. at 15-16. I respectfully dissent.

Our state constitution provides protection against self-incrimination and states that "[n]o person shall . . . be compelled in any criminal matter to be a witness against oneself." Art. I, § 9, Fla. Const. Notwithstanding the majority's conclusion that this Court's interpretation in *Shelly* constitutes an "improper[] expan[sion]" of decisions from the United States Supreme Court and this Court, majority op. at 13, "state courts are absolutely free to interpret state constitutional provisions to accord *greater protection* to individual rights than do similar provisions of the United States Constitution," *Rigterink v. State*, 66 So. 3d 866, 888 (Fla. 2011) (quoting *Arizona v. Evans*, 514 U.S. 1, 8 (1995)).

_____

8. *Shelly v. State*, 262 So. 3d 1 (Fla. 2018).

9. *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 17 -

Because the majority has not chosen to do so, I respectfully dissent.

Application for Review of the Decision of the District Court of Appeal Certified Great Public Importance

Fourth District - Case No. 4D2020-0345

(Palm Beach County)

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, Daniel William Bell, Chief Deputy Solicitor General, and Allen L. Huang, Deputy Solicitor General, Office of the Attorney General, Tallahassee, Florida,

    for Petitioner

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida,

    for Respondent